UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

LEGION PARTNERS HOLDINGS, LLC,

                              Plaintiffs,

      - against -                        19-cv-_____

BED BATH & BEYOND INC., STEVEN H. TEMARES,    **COMPLAINT**
STEPHANIE BELL-ROSE, HARRIET EDELMAN,
PATRICK R. GASTON, JOHNATHAN B. OSBORNE,
HARSHA RAMALINGAM, VIRGINIA P.
RUESTERHOLZ, ANDREA WEISS, MARY WINSTON
and ANN YERGER,

                              Defendants.

------------------------------------------------------------------------x

Plaintiff Legion Partners Holdings, LLC ("Plaintiff" or "Legion"), for its Complaint, against Bed Bath & Beyond Inc. ("Bed Bath" or the "Company"), Steven H. Temares, Stephanie Bell-Rose, Harriet Edelman, Patrick R. Gaston, Johnathan B. Osborne, Harsha Ramalingam, Virginia P. Ruesterholz, Andrea Weiss, Mary Winston and Ann Yerger (the "Director Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. Legion is seeking to elect 10 new directors to the Board of Directors ("Board") at Bed Bath's upcoming annual meeting. Legion's proxy campaign comes in the wake of an extended period of abysmal stock price performance, deteriorating operating performance and inferior corporate governance. During the 15-year tenure of Steven H. Temares, the current CEO, more than $8 billion in market value has been destroyed. Since early 2015, Bed Bath stock has lost over 80% of its value. Yet, the Board richly rewarded Temares and the Company's two aging founders, Warren Eisenberg and Leonard Feinstein, collectively paying them over $313 million in total compensation since 2003.

4987468-4

2.      On March 26, 2019, after unproductive attempts at engagement with the Company, Plaintiff determined that there was an urgent need for wholesale Board and leadership change. Plaintiff announced its intent to nominate a slate of highly qualified candidates (the "Nominees") to replace the entire Board at the 2019 annual meeting of shareholders (the "Annual Meeting"). The Annual Meeting is expected to be held in late June or early July 2019.

3.      Legion's 1,035-page nomination package included a timely notice of intention to nominate individuals for election and completed questionnaires (the "Nomination Package") for the Nominees, as required by Bed Bath's Amended By-Laws ("By-Laws"). On March 31, 2019, Legion voluntarily delivered a 474-page supplement to the Nomination Package.

4.      Bed Bath shareholders should have the ability to choose freely between Legion's slate and the incumbent slate at the Annual Meeting. Defendants, however, have no interest in a fair election. In 2014, Bed Bath and Temares negotiated a $1.5 billion credit agreement for Bed Bath that contains the ultimate firewall to protect incumbent directors: if shareholders vote for the majority's removal, a "Change of Control" may occur, which could ultimately give the lender the right to declare an Event of Default (the "Proxy Penalty"). The Director Defendants thus have a powerful tool to perpetuate their control against the will of the shareholders.

5.      The Director Defendants, however, have the power to alleviate any threat of a default by "approving" the Nominees as "Continuing Directors" solely for purposes of the change-of-control clause. To do so would cost Bed Bath nothing. Indeed, numerous corporate boards have recognized that these clauses were not intended to restrict a shareholder's right to vote at an annual meeting, but rather to prevent a hostile acquisition against the wishes of the Board and without a vote by the shareholders. Thus, boards with similar agreements routinely issue the "approval" necessary to confer "continuing director" status on any nominee elected at an annual meeting

("Proxy Put Exemption"). Such approval is not an endorsement or recommendation: the Company and Board may oppose the Nominees in a proxy fight. In the rare case where boards have refused, courts have protected the most fundamental right of a shareholder—the right to vote for directors. Remarkably, the Director Defendants have refused to issue any such approval. As the proxy contest proceeds, they will no doubt remind shareholders, either *sotto voce* or in bold print, that a vote for Legion's slate could spell financial catastrophe. The declaratory and injunctive relief sought is necessary to allow shareholders to choose directors at the Annual Meeting in a fair election, based on the merits of the competing slates and candidates.

6. Plaintiff asks that the Court, for purposes of defusing any Proxy Penalty under the Change of Control Provisions in the Company's agreements, to (i) **declare** that the Nominees are qualified as "Continuing Directors"; and (ii) **compel** the Director Defendants to approve the Nominees under the Proxy Put Exemption.

## PARTIES

7. Plaintiff is a Delaware limited liability company with a principal place of business in Beverly Hills, California. Plaintiff's members are citizens and residents of California. Plaintiff is record owner of 200 shares of Company stock.

8. Defendant Bed Bath (NASDAQ: BBBY) is a New York corporation with its principal place of business in Union, New Jersey. Bed Bath offers high quality products, services and solutions for the home and operates an e-commerce platform and retail store base of 1,552 stores under Bed Bath & Beyond and other brand names including buybuy BABY, Cost Plus and the Christmas Tree Shops.

9. Defendant Steven H. Temares, 60, has been the Company's Chief Executive Officer since 2003 and a director for at least twenty years. Upon information and belief, Temares resides in New Jersey and is a citizen of that state.

3

10. Defendant Stephanie Bell-Rose, 61, a Senior Managing Director at TIAA and Head of the TIAA Institute, has been designated an independent director. She has served on the Board since 2018 and is a member of the Nominating and Governance Committee ("Nominating Committee"). Upon information and belief, Bell-Rose resides in New York and is a citizen of that state.

11. Defendant Patrick R. Gaston, 61, Chief Executive Officer, Gaston Consulting, and past President of the Verizon Foundation and the Western Union Foundation, has been designated an independent director. He has served on the Board since 2007, is a member of the Compensation Committee and was appointed Lead Independent Director on April 10, 2019, and Independent Chairman on April 26, 2019, and is a member of the Nominating Committee. Upon information and belief, Gaston resides in Colorado and is a citizen of that state.

12. Defendant Johnathan B. Osborne, 38, Co-Founder/Chief Executive Officer, Red Antler, has been designated an independent director. He has served on the Board since 2018 and is a member of the Audit Committee. Upon information and belief, Osborne resides in New York and is a citizen of that state.

13. Defendant Virginia P. Ruesterholz, 58, a retired executive of Verizon Communications Inc., has been designated an independent director and is a member of the Nominating Committee. She has served on the Board since 2017. Upon information and belief, Ruesterholz resides in Florida and is a citizen of that state.

14. Defendant Harriet Edelman, 63, Vice Chairman of Emigrant Bank, has been designated an independent director. She was appointed to the Board on May 1, 2019. Upon information and belief, Edelman resides in New York and is a citizen of that state.

15. Defendant Harsha Ramalingam, 60, a senior advisor at Boston Consulting Group

and president of his own consulting firm, has been designated an independent director. He was appointed to the Board on May 1, 2019. Upon information and belief, Ramalingam resides in Washington and is a citizen of that state.

16.     Defendant Andrea Weiss, 64, Founding Partner of the O Alliance, LLC and Chief Executive Officer of Retail Consulting, Inc., has been designated an independent director. She was appointed to the Board on May 1, 2019. Upon information and belief, Weiss resides in Florida and is a citizen of that state.

17.     Defendant Mary Winston, 57, former Executive Vice President and Chief Financial Officer of Family Dollar Stores, has been designated an independent director. She was appointed to the Board on May 1, 2019. Upon information and belief, Winston resides in North Carolina and is a citizen of that state.

18.     Defendant Ann Yerger, 57, former Executive Director of the Counsel of Institutional Investors, has been designated an independent director. She was appointed to the Board on May 1, 2019. Upon information and belief, Yerger resides in Washington, D.C. and is a citizen of the District of Columbia.

## JURISDICTION AND VENUE

19.     Plaintiff seeks a declaration under 28 U.S.C. § 2201.

20.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of California. Upon information and belief, Defendants are citizens of New York, New Jersey, Colorado, Florida, North Carolina, Washington and the District of Columbia. The amount or value in controversy exceeds the sum of $75,000, exclusive of interest and costs.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to this action occurred in this District and all defendants are subject to personal jurisdiction in New York.

4987468-4

## FACTUAL ALLEGATIONS

### A.  THE BOARD'S FAILURE TO ADDRESS BED BATH'S DISASTROUS PERFORMANCE

22.     By early 2019, the Board, which then had an average director tenure of 19 years, had demonstrated that it was incapable of meeting the challenges of retail in the age of Amazon. By that point Co-Chairman Eisenberg and Feinstein had each worked at Bed Bath for 48 years and CEO Temares for 26 years. None of the independent directors had significant consumer retail experience apart from service on the Bed Bath Board. This lack of relevant expertise may explain why the Board simply stood by as more than $8 billion in market value was destroyed over Temares' 15-year tenure as CEO.

23.     Bed Bath's stock significantly underperformed the S&P 500, Russell 2000, its proxy peer group and the Company's closest retail peers over a one, three, five and ten-year period as well as since April 2, 2003, when Temares took the helm as the Company's CEO.

**Share Price Performance (Total Shareholder Return Including Dividends)**

|  | 1-Year | 3-Year | 5-Year | 10-Year | Since April 2, 2003 |
|---|---|---|---|---|---|
| **Bed Bath & Beyond** | **(33%)** | **(70%)** | **(78%)** | **(39%)** | **(58%)** |
| S&P 500 Index | 10% | 46% | 67% | 328% | 342% |
| Russell 2000 Index | 1% | 45% | 37% | 314% | 397% |
| Proxy Peer Group[1] | 17% | 1% | 28% | 471% | 742% |
| Closest Retail Peers[2] | 11% | 27% | 51% | 404% | 592% |

Source: SEC Filings, Bloomberg, Capital IQ as of 3/22/19

Not only is the performance of Bed Bath below its peers and indices, the performance is negative for all time periods noted.

---

[1] The "Proxy Peer Group" consists of the 18 companies identified as peers in the Company's Proxy for the 2018 Annual Meeting: AAP, AZO, DKS, DDS, DG, DLTR, FL, GME, GPS, KSS, LB, M, JWN, ODP, ORLY, ROST, WSM.

[2] "Closest Retail Peers" consists of peers identified by Legion: FND, HD, TSCO, LOW, WMT, HOME, RH, TGT, WSM, TTS, MIK, TCS, BBY, DKS, ODP, KIRK, JCP, KSS, JWN, M, BURL, ROST, TJX.

6

24. Two questionable related-party transactions with the Co-Chairmen's children exacerbated shareholder concerns. In March 2007, two of Feinstein's sons sold Bed Bath an eight-store chain now known as buybuy Baby for $67 million in cash and a $19 million debt repayment including $3 million of debt owed to Feinstein. In January 2017, a son of Eisenberg sold Bed Bath an underperforming small business known as Chef Central for $1 million in cash plus an earn out.

25. The Company continued to reward Eisenberg, Feinstein and Temares in the face of Bed Bath's decline and shareholder disapproval of their compensation. Eisenberg and Feinstein have been paid over $60 million each since 2003, the year that they transitioned to Co-Chairmen. CEO Temares, under whose tenure Bed Bath's shares have declined 58% compared to its closest retail peers, which are up 592%, has been paid over $180 million since 2003.

26. Glass, Lewis & Co. ("Glass Lewis") and Institutional Shareholder Services, Inc. ("ISS"), the two most prominent proxy advisory firms, took note. In 2018, ISS gave the Company the lowest possible score in its Compensation category. Glass Lewis gave each of the Company's 2018 and 2017 executive compensation plans a grade of "F" in its pay-for-performance model, noting that Bed Bath paid more compensation to its named executive officers than the median compensation for its peer group but performed worse than its peers in a number of different performance measures, including both return on assets and return on equity in 2018.

27. Shareholders tried, in vain, to effect change. At each annual meeting, the Company asks shareholders to vote on a non-binding proposal to approve the compensation paid in the prior year to the Company's named executive officers. At each of the meetings for 2015, 2016, 2017 and 2018, the shareholders voted against the Company's proposal. In 2016, the vote was a resounding 95,770,691 "Against"; 28,035,787 "For"; and 215,138 "Abstain"; in 2018, the vote was an equally dramatic 85,077,023 "Against"; 23,180,537 "For"; and 329,114 "Abstain".

4987468-4

28. By the 2018 Annual Meeting, shareholders had enough and cast 56% of their votes "Against" Victoria Morrison, a member of the Compensation Committee and the Nominating Committee. In response, she tendered her resignation. The Board thumbed its collective nose at the shareholders by voting unanimously to keep Morrison on the Board and reinstated her to the Nominating and Governance Committee.

### B.    LEGION NOMINATES ITS SLATE

29. This blatant behavior to circumvent the will of the shareholders coupled with continuing poor performance led Plaintiff and other concerned shareholders to conclude that it was necessary to replace the entire Board.

30. In November and December 2018, Plaintiff began to discuss its concerns with affiliates of Macellum Management, LP (the "Macellum Group"). Plaintiff and the Macellum Group in turn tried to engage with the Company but no meaningful discussions ensued. Plaintiff determined to seek change at the Annual Meeting.

31. The process of nominating directors to the Board of Bed Bath is governed by Article II, Section 10 of its By-Laws. Article II, Section 10(A)(1)(a)(iii) of the By-Laws, provides, in relevant part, that nominations for the Board of Directors may be made at an annual meeting of shareholders by "any shareholder of the Corporation who . . . complies with the notice procedures set forth in this Section 10(A)(1) as to such nomination."

32. Article II, Sections 10(A)(1)(c)(i) and (ii) of the By-Laws, provides that to be in proper form, the nominating shareholder's notice must provide certain information regarding the nominating shareholder and nominees to the Company, including:

> (x) all information relating to such person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder (including

    such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected).

The By-Law incorporates the disclosure requirements in SEC Rule 14a-3(a)(1) and Schedule 14A.

  33. In addition, Article II, Section 10(A)(1)(c)(iii) of the Bylaws provides that,

    with respect to each nominee for election or reelection to the Board of Directors, **include a completed and signed questionnaire,** representation and agreement required by Section 12 of this Article II. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation or that could be material to a reasonable shareholder's understanding of the independence, or lack thereof, of such nominee.

(Emphasis added.)

  34. Article II, Section 12 of the By-Laws, Submission of Questionnaire, Representation and Agreement, provides that the nominee must deliver a written questionnaire and a written representation and agreement to disclose any voting commitments and arrangements related to service as a director and make certain representations, including that the nominee "will comply with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation."

  35. On March 20, 2019, Plaintiff, certain Plaintiff's affiliates, the Macellum Group and certain affiliates of Ancora Advisors, LLC (collectively, the "Dissidents") entered into an agreement, pursuant to which they agreed to, among other things, work together to nominate directors and solicit proxies for their election (the "Dissidents Agreement").

  36. The Dissidents carefully identified a highly qualified group of candidates with the experience, commitment and skills to oversee the turnaround at Bed Bath. The Nominees include candidates with experience in sourcing, supply chain and private label (Janet E. Grove, Victor Herrero Amigo and Hugh R. Rovit); retail operations (Theresa R. Backes, Sue Ellen Gove, Cynthia

4987468-4

S. Murray, Alexander Smith and Jeffrey A. Kirwan), marketing, branding and e-commerce (David A. Duplantis, John E. Fleming, Jeremy I. Liebowitz and Martine M. Reardon) and investments, governance, real estate and turnarounds (Joseph Boehm, Jonathan Duskin, Jon Lukomnik and Joshua E. Schechter).

37. On March 26, 2019, Legion delivered the 1,035 Nomination Package to Bed Bath, and on March 31, 2019, a voluntary 474-page supplement.

38. On April 18, 2019, Legion filed its preliminary proxy statement with the SEC.

**C.   THE THREAT PRESENTED BY THE PROXY PENALTIES**

39. The Proxy Penalty is contained within the Company's 3.749% senior unsecured notes due 2024, 4.915% senior unsecured notes due 2034 and 5.165% senior unsecured notes due 2044 (collectively, the "Notes"). The aggregate principal amount of the Notes is $1.5 billion. The Indenture and First Supplemental Indenture (collectively, the "Indenture") for the Notes define a "Change of Control" as, among other things, on the first day on which a majority of the board of directors are not "Continuing Directors," which are defined as the directors in place as of July 17, 2014 or directors nominated for election or appointed by Continuing Directors. Any such Change of Control becomes a triggering event under the Indenture if, sixty (60) days following the first public notice of a change of control, the rating on any of the Notes is downgraded below investment grade. In the event of a change of control and downgrade, the Company must offer to repurchase all or part of the Notes as set forth in the applicable Note. To avoid triggering a Proxy Penalty under the Notes, the Indenture permits a committee of a majority of independent Continuing Directors or a majority of Continuing Directors to "approve" of the nomination of a new director, thereby conferring "Continuing Director" status on that person if elected.

40. Certain employment agreements and compensation plans also include provisions which are triggered by a change of control of the Board. These include Temares' Performance

10
4987468-4

Stock Unit Agreement under the 2012 Incentive Compensation Plan (effective 2017) and Temares' Amended and Restated Supplemental Retirement Benefit Agreement dated August 11, 2009 and the Company's 2004 Incentive Compensation Plan, the 2012 Incentive Compensation Plan, the Amended and Restated Nonqualified Deferred Compensation Plan, effective January 1, 2006 and adopted December 18, 2008 and the 2018 Incentive Compensation Plan (collectively, "Employment Agreements and Plans"). Each Employment Agreement and Plan permits a nominee to be approved as an "Incumbent Director" to avoid triggering a Proxy Penalty.

41. On March 28, 2019, Legion delivered a letter to the Board explaining its concerns that following the Annual Meeting, should the Nominees constitute a majority of the Board, their appointment could trigger the Proxy Penalties. In order to maintain a level playing field, Legion requested written confirmation from the Company that the Board would certify each Nominee as a "Continuing Director" under the Indenture and Employment Agreements and Plans such that the Proxy Penalties would not be triggered.

42. Legion asked for a response from the Company no later than April 3, 2019, and when the Company refused to commit to a position, Legion wrote again on April 5, 2019.

43. Following an already established pattern, on April 12, 2019, the Company responded that it was considering the request and demanded in person interviews with the Nominees, although interviews are not required under the By-Laws, not necessary for approval as "Continuing Directors," and the information already provided by the Nominees far exceeded regulatory requirements. The effort to condition the election of the Nominees on "interviews" is a transparent attempt by the Director Defendants to have their opinions regarding the Nominees supplant those of the shareholders.

4987468-4

44. The risk of a billion-dollar default provides a powerful weapon for the Company to use in a proxy contest, as the drastic financial consequences of acceleration raises the specter of a liquidity crisis. Used in this way, the Proxy Penalty serves no legitimate business purpose and is designed to coerce shareholders into re-electing incumbent directors. The risk of default, however, is entirely in the control of the Director Defendants, because they can under every agreement, "approve" the Nominees as "Continuing Directors" should they receive a majority vote at the Annual Meeting.

    **D.    THE RECONSTITUTED BOARD**

45. Bed Bath no doubt received responses from many investors in the wake of Plaintiff's nominations. Recognizing that defeat was inevitable for any Board with such a disastrous record, Bed Bath chose to play musical chairs. On April 22, 2019, Bed Bath abruptly announced that as of May 1, 2019, "in response to shareholder feedback," Eisenberg and Feinstein would retire from the Board, thereby reducing the Board from 12 to 10 seats, and the five longest-tenured independent directors would resign. The old Board appointed five new directors to replace those who resigned. Temares remained as CEO.

46. The Board claimed (lamely) that these changes had been made as part of "its commitment to accelerating refreshment at the Board-level." While the old Board conferred "Continuing Director" status on the new members, it did not do so for Plaintiff's Nominees.

47. The five new directors joined the Board on May 1, 2019. To date, the "refreshed" Board has continued to stonewall Plaintiff's modest request that its Nominees be approved as "Continuing Directors."

48. On May 7, 2019, the Company – not any of the new directors – again wrote that it was considering the request and demanded in person interviews. The Company broadly insinuated

4987468-4

that it had "uncovered" certain information but, tellingly, gave no indication what the "information" was or which Nominee (if anyone) it concerned.

49. On May 9, 2019, Plaintiff delivered a Supplement to the Nomination Package to the Company, which withdraw the nominations of six candidates (Victor Herrero Amigo, Joseph Boehm, David A. Duplantis, Jon Lukomnik, Martine M. Reardon and Joshua E. Schechter), thereby reducing its slate to 10 Nominees (Theresa R. Backes, Jonathan Duskin, John E. Fleming, Sue Ellen Gove, Janet E. Grove, Jeffrey A. Kirwan, Jeremy I. Liebowitz, Cynthia S. Murray, Hugh R. Rovit and Alexander W. Smith).

50. There is no good-faith explanation for the Director Defendants' continuing stall, delay and stonewall strategy. They have not questioned the character or credentials of any Nominee. Instead, they have hidden behind a wall erected by the Company.

51. The Director Defendants' refusal to "approve" the Nominees serves no corporate interest and has no purpose other than to infringe upon shareholders' exercise of their right to vote as well as Plaintiff's right to run a competing slate.

## COUNT I
### (Against the Director Defendants)
### Injunctive Relief for Breach of Fiduciary Duty

52. Plaintiff repeats and realleges the preceding paragraphs as if set forth fully herein.

53. As directors of the Company, the Director Defendants owe Bed Bath's shareholders, including Legion, unyielding duties of care, loyalty, good faith and candor.

54. The Director Defendants have refused to approve the Nominees as continuing directors, and therefore have refused to take the steps necessary to neutralize the Proxy Penalties in the event that the Nominees are elected to the Board, without any reasonable basis or justification. Rather, the Director Defendants have refused to approve the Nominees for the sole purpose of obstructing the ability of shareholders to remove the Director Defendants from office.

13

55. As a result of the Director Defendants' breaches, Bed Bath shareholders will be deprived of their opportunity to decide whether to support the Nominees free from the coercive effects of over $1.5 billion in potential Proxy Penalties in connection with the election of directors at the 2019 Annual Meeting.

56. Plaintiff seeks an injunction requiring the Director Defendants, as provided for under the applicable agreements, to approve the Nominees as "Continuing Directors" under the Proxy Put Exemptions to neutralize the Proxy Penalties.

57. The balance of equities weighs in Plaintiff's favor.

58. Plaintiff lacks an adequate remedy at law.

## COUNT II
### Declaration that Nominees Are "Continuing Directors" for Purposes of Proxy Put Exemption

59. Plaintiff repeats and realleges the preceding paragraphs as if set forth fully herein.

60. Each of the Indenture, Employment Agreements and Plans contain a Proxy Put Exemption that provides that the Board may render the Proxy Penalties inoperable by approving the Nominees as "Continuing Directors" in the event they are elected to the Board.

61. Under the unambiguous terms of the Indentures, Employment Agreements and Plans, as provided for under the applicable agreement, the sole approval necessary to invoke the Proxy Put Exemption is the approval of the Director Defendants.

62. Plaintiff is entitled to a declaration requiring the Director Defendants to approve the Nominees to nullify the Proxy Puts.

WHEREFORE, Plaintiff requests that the Court enter an order or judgment in its favor against Defendants as follows:

    A. Declaring that the Director Defendants have breached their fiduciary duties by refusing to approve the Nominees as Continuing Directors;

B.      Directing the Director Defendants to approve the Nominees as Continuing Directors under the Proxy Put Exemption in advance of the Annual Meeting;

C.      Awarding Legion's costs of the proceedings herein; and

D.      Granting Legion such other relief as the Court may deem just and proper.

Dated: May 10, 2019

OLSHAN FROME WOLOSKY LLP

By: /s/ Adrienne M. Ward
Thomas J. Fleming
Adrienne M. Ward
Richard W. Nicholson, Jr.
1325 Avenue of the Americas
New York, New York 10019
212-451-2300
tfleming@olshanlaw.com
award@olshanlaw.com
rnicholson@olshanlaw.com

*Attorneys for Plaintiff*

4987468-4